UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
(at Montgomery)

| | | |
|---|---|---|
| THOMAS L. BRANTLEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 09-230-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| INTERNATIONAL PAPER | ) | **MEMORANDUM OPINION** |
| COMPANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiffs filed this action in March 2009, alleging that Defendant International Paper Company ("IP") caused them personal injuries and damaged their properties by releasing hazardous substances into the environment. The plaintiffs consist of more than 300 residents of Prattville, Alabama, where IP operates a mill, which uses a kraft pulping process to make paper for various products. The plaintiffs have alleged claims of trespass, public nuisance, private nuisance, negligence, wantonness, negligence *per se*, abnormally dangerous activity, and fraudulent suppression. [1] On May 15, 2009, IP filed a motion to dismiss, which

---

[1] Other individuals filed a similar case against IP the same day, seeking class-action certification. *Benefield v. Int'l Paper Co.*, No. 2: 09–CV–232 (M.D. Ala.). A similar, non-class action styled, *Brooks v. Int'l Paper Co.*, No. 2: 09–CV–946 (M.D. Ala.), was filed on October 8, 2009. *Brantley* and *Brooks* were consolidated for purposes of discovery on November 10, 2009. *Benefield* was dismissed upon the parties' stipulation of dismissal on December 7, 2010. Likewise, *Brooks* was dismissed by agreement on November 18, 2011.

the Court granted in part and denied in part.  [Record No. 33]  Specifically, the Court dismissed with prejudice the negligence *per se* claims and dismissed without prejudice the trespass, nuisance, negligence, wantonness, and fraudulent suppression claims.  [Record No. 41]  On September 21, 2009, the plaintiffs filed an Amended Complaint, reasserting the claims that were dismissed without prejudice.  [Record No. 42]

Thereafter, the parties were permitted to select a group of 40 "test plaintiffs" to streamline the discovery process.  These plaintiffs would constitute the first phase of litigation and would be the focus of the case up through the filing of dispositive motions.  [Record No. 92, p. 5]  A handful of the test plaintiffs later dropped their claims voluntarily or left the group for other reasons, reducing the group of test plaintiffs to 26.

In October 2011, the plaintiffs moved the Court to take judicial notice of approximately 150 scientific facts which appear to be excerpted primarily from EPA and Alabama Department of Environmental Management publications, as well as the mill's operating permit.  [Record No. 182]  On October 28, 2011, IP moved for summary judgment on the plaintiffs' claims of negligence, wantonness, nuisance, trespass, and abnormally dangerous activity.  [Record No. 183]  The same day, IP filed separate motions for summary judgment regarding the plaintiffs' personal injury claims [Record No. 185], fraudulent suppression claims [Record No. 187],

and the test plaintiffs' property damage claims [Record No. 189]. IP also filed motions to exclude the testimony of the plaintiffs' expert witnesses. [Record Nos. 191, 193, 195]

The plaintiffs then filed a second motion for judicial notice [Record No. 197], as well as a motion for partial summary judgment [Record No. 201]. The plaintiffs also moved to exclude the testimony of IP's expert witnesses. [Record Nos. 203, 205, 210, 212, 216, 218] In September 2012, Judge Thompson, who recently had been assigned the case, temporarily denied all pending motions without prejudice.[2] At that time, the Court advised that the motions would be "sua sponte reinstated . . . one by one or in groups." *Id.*

On November 8, 2013, the plaintiffs moved the Court to set a trial date. [Record No. 271] IP opposed the motion and asked the Court to rule on the numerous motions that were denied temporarily in September 2012. [Record No. 272] The matter was reassigned from Judge Thompson to the undersigned in August 2016. [Record No. 274] Thereafter, a conference was held during which the parties discussed their positions regarding the status of the case. [Record No. 282] The parties asked the Court to defer ruling on the pending motions for a brief period so that they might discuss informal resolution of the matter. Shortly after the

---

[2] In May 2012, the Court denied the plaintiffs' second motion to compel mediation, stating that "mediation . . . is purely voluntary." [Record No. 266]

conference, the plaintiffs filed a status report indicating that resolution of the claims had not been accomplished. [Record No. 284] Accordingly, the Court will now address all pending motions.

## I. Regulatory Background

Before delving into the parties' filings, it is helpful to examine the regulatory context in which the Prattville mill operates. The federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*, is the primary statutory scheme under which air emissions in the United States are managed. *North Carolina v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010). Under this Act, the EPA develops acceptable levels of airborne emissions, known as National Ambient Air Quality Standards ("NAAQS"), "the attainment and maintenance of which . . . are requisite to protect the public health." *Id.* at 298–99. There are primary NAAQs which are intended to protect individuals, and secondary NAAQS which are intended to protect the environment. The EPA has set NAAQS for six "criteria air pollutants" or CAPS. These include: carbon monoxide (CO); lead; nitrogen dioxide ($NO_2$), ozone ($O_3$), particle pollution ($PM_{2.5}$ and $PM_{10}$), and sulfur dioxide ($SO_2$). NAAQS are meant to set a uniform level of air quality to ensure both a healthy populace and environment. *Id.* at 299. Primary NAAQS protect the health of "sensitive" populations such as asthmatics, children, and the elderly. *See Mississippi Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 146 n.2 (D.C.C. 2015).

Congress has recognized that air pollution prevention and control is the primary responsibility of the states. *North Carolina*, 615 F.3d at 299 (citing 42 U.S.C. § 7410(a)(3)). Accordingly, decisions regarding how to meet NAAQS are left to the individual states. Each state must develop a State Implementation Plan ("SIP"), which is submitted to the EPA for approval. *See* 42 U.S.C. § 7410. *See also Ala. Envtl. Council v. Adm'r, U.S. EPA*, 711 F.3d 1277, 1280 (11th Cir. 2012). SIPs must include "enforceable emission limitations and other control measures, means, or techniques" to ensure that each state meets NAAQS. 42 U.S.C. § 7410(a)(2)(A). The Alabama Department of Environmental Management ("ADEM") oversees the Alabama Air Pollution Control Act of 1971, Ala. Admin. Code. § 335-3-1 *et seq.* (SIP codified at 40 C.F.R. § 52.69).

The National Emissions Inventory ("NEI") is a "comprehensive and detailed estimate of air emissions of criteria pollutants, criteria precursors, and hazardous air pollutants[3] from air emissions sources." National Emissions Inventory, https://www.epa.gov/air-emissions-inventories/national-emissions-inventory-nei (last visited May 22, 2017). The NEI is released every three years based on data collected from state and local agencies for sources in their jurisdictions, and

---

[3] "Hazardous air pollutants" are also known as "toxic air pollutants" or "air toxics" and are "those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects." What are Hazardous Air Pollutants? https://www.epa.gov/haps/what-are-hazardous-air-pollutants (last visited May 22, 2017).

supplemented by data developed by the EPA.

The Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.* was passed in 1986 in response to concerns regarding the environmental and safety hazards posed by the storage and handling of toxic chemicals. Under EPCRA, owners and operators of certain facilities are required to submit toxic release inventory ("TRI") reports for listed chemicals that are "manufactured, processed, or otherwise used," above specified threshold levels. 42 U.S.C. § 11023(a). "In general, chemicals covered by the TRI program are those that cause one or more of the following: cancer or other chronic human health effects; significant adverse human health effects; significant adverse environmental effects." *See* https://www.epa.gov/toxics-release-inventory-tri-program/tri-listed-chemicals (last visited May 22, 2017). *See* 40 C.F.R. § 372.65 (listing specific chemicals subject to reporting requirements).

## II. Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides that: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court created a special gatekeeping role for trial courts, intended to

"keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

The *Daubert* Court provided four non-exhaustive factors that courts should consider in assessing reliability under Rule 702: (1) whether the expert's theory or technique can and has been tested; (2) whether it has been subjected to peer review; (3) whether it has a high known or potential rate of error; and (4) whether the theory or technique has gained general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94. The reviewing court's primary focus should be on the expert's principles and methodology—not the conclusions reached. *Allison*, 184 F.3d at 1312. Factors that may negatively impact reliability are improper reliance on anecdotal evidence or temporal proximity, or engaging in improper extrapolation. *See id.* Additionally, the expert's testimony must "logically advance[] a material aspect of the proposing party's case." *Id.* Evidence must have a "valid scientific connection" to disputed facts in the case—otherwise it is not helpful to the jury. *See id.*

When analyzing a challenge under *Daubert*, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). Although the trial court should act as a gatekeeper, "its role is not intended to supplant the adversary system or the role of the jury," and "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (citing *Daubert*, 509 U.S. at 596).

## A. Defendant's Motion Exclude Dr. Nicholas Cheremisinoff [Record No. 191]

The plaintiffs retained Dr. Nicholas Cheremisinoff to perform an assessment of environmental exposures in the community of Prattville, Alabama to chemical emissions from IP's mill. [Cheremisinoff Report, Record No. 200–8, p. 2] Cheremisinoff holds an M.S. and a Ph.D. in chemical engineering and specializes in the safe handling and management of chemicals and hazardous materials. *Id.* at p. 5. He has more than 35 years of experience in his field, which includes working as a research scientist for a paper manufacturing company. *Id.* Additionally, he has held various academic positions and served as a consultant to government and industry on industrial waste, worker safety, and environmental management. *Id.*

### 1. TRI Underreporting

Pursuant to the Toxics Release Inventory program, covered entities generally

must report emissions of any listed chemical manufactured or processed in an amount in excess of 25,000 pounds in a given year. 40 C.F.R. § 372.25.[4] Dr. Cheremisinoff devoted a significant portion of his report to an opinion that IP underreported its emissions to the TRI program. *Id.* at p. 24. He compared IP's TRI data from 1987 through 2008 with National Emissions Inventory data from 2002 and 2005, and prepared histograms and line plots, which he contends is a common technique used by engineers and scientists to assess the accuracy and reliability of data. *Id.* at 27. Through this technique, Cheremisinoff attempts to show that IP has failed to report chemicals "which would have been released . . . at levels well above the reportable [TRI] threshold limits." *Id.* at 25.

There is no suggestion using that NEI data to gauge TRI reporting compliance is generally accepted within the scientific community. Additionally, there is no indication that this method has been subjected to peer review. Cheremisinoff did not fully explain how his analysis of NEI data provides a reliable indication of the accuracy of IP's TRI reporting. Instead, he commented that, in light of the NEI data, he found it "odd" that IP had not reported certain releases to the TRI. [Record No. 200–22, p. 54]

Cheremisinoff goes on to explain that IP's 22 years of TRI reports reflect only

---

[4] At the program's inception in 1987, the general reporting threshold was 75,000 pounds. In 1988, it was reduced to 50,000 pounds. In 1989, it was further reduced to 25,000 pounds, where it has remained. 40 C.F.R. § 372.25.

about 8 million more pounds of total emissions than a single year under the 2002 NEI report. Likewise, he asserts, the 22 years of TRI reports indicate only about twice the amount of emissions reflected in the 2005 NEI data. [Record No. 200–8, p. 33] However, Cheremisinoff fails to acknowledge the significant distinctions between the TRI and NEI.[5] While there is substantial overlap in the entities that must report under the two programs, the substances covered are not identical. The NEI provides a broad swath of data regarding CAPS and HAPS, while the TRI covers only a subset of enumerated toxic substances.[6] Importantly, facilities self-report to the TRI using data based on the facility's actual emissions, while NEI data is gleaned from state and local sources. *See Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 45 (D.C.C. 2009) (emphasis added). Often, state and local sources provide incomplete data and the EPA is forced to "fill in the gaps" by estimating the emissions. [*See* Record No. 200–8, p. 15] Dr. Cheremisinoff conceded during his deposition that a direct comparison between data from the two programs was not possible. [Record No. 200–22, p. 42]

---

[5] Factors to Consider When Using TRI Data, https://www.epa.gov/sites/production/files/2015-06/documents/factors_to_consider_6.15.15_final.pdf (last visited May 22, 2017).

[6] *Compare* https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-data, https://www.epa.gov/haps/what-are-hazardous-air-pollutant, https://www.epa.gov/criteria-air-pollutants (last visited May 22, 2017), *and* https://www.epa.gov/toxics-release-inventory-tri-program/tri-listed-chemicals (last visited May 22, 2017)

Each year, facilities like IP perform calculations to determine whether they have exceeded the reporting threshold for TRI-listed chemicals and, thus, whether they must report their emissions. Such facilities are required to send documentation ("Form R") to the EPA as part of their TRI reporting obligations. Dr. Cheremisinoff did not review IP's Form Rs or any of its backup calculations. *Id.* at p. 47. Cheremisinoff concedes that, as a result, he was unable to compare the facility's actual emissions against the TRI reporting thresholds. *Id.* at p. 54. There is no suggestion that IP's documentation was unavailable for analysis. Rather, Cheremisinoff states that the discovery was "overwhelming" because IP had provided approximately one million documents. [Record No. 200–22, p. 16] Further, he asserts that the material was disorganized and he could not find certain documents, including "detailed emissions inventories prepared by [IP]." *Id.*

Cheremisinoff testified that he would have liked to have reviewed IP's Form Rs and backup calculations because this documentation "get[s] close to being an emissions inventory." *Id.* at 47. He further states that the internal calculations are "tied to production levels, to the assumptions and emission factors that are used by the facility in making that estimate." *Id.* He concedes that examining the mill's underpinning calculations would likely have been the most reliable way to determine whether underreporting had occurred. *Id.* at 48–49. However, voluminous discovery does not excuse an expert's failure to provide a reliable basis for his

opinion. This is particularly true when, as here, there is no indication that the plaintiffs attempted to resolve this issue by requesting that IP identify the documents. Further, the plaintiffs did not file a motion regarding the manageability of the discovery documents. Accordingly, the plaintiffs cannot now rely on the volume of discovery as a basis for their expert's failure to consider this material.

In addition to the issues already discussed, there are other problems with Cheremisinoff's methods. He used NEI data in an attempt to demonstrate, through "emissions trends," that IP failed to meet its TRI reporting obligations. [Record No. 200–8, p. 27] Although Cheremisinoff initially alleged that IP had "consistently not reported" reduced sulfur compounds, *id.* at p. 28, he later retreated from that position during his deposition, testifying that the statement was inaccurate. [Record No. 200–22, p. 55] Cheremisinoff also tried to demonstrate that IP had underreported its methanol emissions. [Record No. 200–8, p. 29] He asserted that emissions of methanol necessarily increase as emissions of other volatile organic compounds (VOCs) increase. *Id.* Relying on NEI and TRI data, Cheremisinoff alleged that IP must have underreported its methanol emissions from 1987 through the early 1990s because the emissions of acid aerosols and other VOCs were significantly higher. *Id.* at pp. 28–29. Like Cheremisinoff's other opinions regarding TRI reporting, this assertion is undermined by his failure to consult IP's calculations and Form Rs.

Cheremisinoff compared the number of years that IP had reported emissions

of certain chemicals under the TRI to the number of years it had not reported those same chemicals. He believed that IP had not significantly changed its pollution-control measures and, therefore, it must have underreported in the years it did not report the emissions. However, without more, this conclusion is little more than the expert's *ipse dixit*.[7] *See Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (opinion is inadmissible when connection between data and conclusion is the expert's own assertion). Although Cheremisinoff reportedly "spot-checked" the list of chemicals subject to TRI reporting, [Record No. 200–22, p. 50], several of the chemicals he identified actually were not subject to the TRI reporting requirement during the 22-year period.[8] Further, without having examined IP's internal documents, Cheremisinoff could not be aware of IP's production rates and other issues that might have affected emissions for the years in issue.

The plaintiffs did not respond meaningfully to IP's challenge regarding TRI reporting. [Record No. 234, p. 46] Rather, they contend that Cheremisinoff's method was the most scientifically reliable one available. However, even

---

[7] It appears that IP erroneously reported its hydrochloric acid mist release as 31,000 pounds in 2000. It is reasonable to assume that IP omitted a zero from the reported value, since every other year it reported emissions in the range of 300,000 pounds. [Record No. 200–8, p. 27] However, the plaintiffs have not explained how this alleged single instance of underreporting impacts their claims.

[8] For example, Cheremisinoff identified acetone as "not reported" for 15 out of 22 years. But, acetone was removed from the list in 1993. Additionally, he listed methyl ethyl ketone as "not reported" for 8 years. This substance was deleted from the list in 2003. [Record No. 200– 8, p. 24]

Cheremisinoff conceded that was not the case. For the reasons stated herein, Dr. Cheremisinoff's opinions regarding TRI underreporting will be excluded from consideration.

### 2. Corrosion Study

While IP argues that Dr. Cheremisinoff is unqualified to offer an opinion regarding corrosion, his education and experience in chemical engineering renders him sufficiently qualified in this area. Any lack of experience in this particular field bears on his credibility rather than his qualification to offer an opinion. *See, e.g., Smith v. Ortho Pharm. Corp.*, 770 F. Supp. 1561, 1567 (N.D. Ga. 1991) (fact that expert was not specialist went to credibility rather than admissibility). *See also StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, No. 8: 13-2240, 2015 WL 3824170, at *4 (M.D. Fla. June 19, 2015) (qualification for an expert is "not stringent and so long as the expert is minimally qualified, objections . . . go to credibility and weight, not admissibility.").

Cheremisinoff performed a study regarding corrosion of metal items in the Prattville community. [Record No. 200–8, p. 71] He began by reviewing more than 100 plaintiff affidavits in which Prattville residents described their property as having been damaged by "pitting and corrosion." *Id.* Cheremisinoff theorized that, since sulfur dioxide and other emissions are widely known to contribute to corrosion, the mill's emissions were likely to have caused the plaintiffs' property damage. *See*

*id*. at pp. 73–77.

Thirteen metal samples were obtained from seven properties in the community but none belonged to the test plaintiffs. *Id.* at 77. Cheremisinoff sent the samples to the St. Louis Testing Laboratories where a corrosion/material evaluation of the corroded metal components was performed. *Id.* Corrosion products and residues were chemically analyzed using an energy dispersive spectrometer (EDS) equipped scanning electron microscope (SEM) to assess the corrosive elements. *Id.* at 78. Eight of the samples showed elevated levels of either "chlorides, sulfur, or both." *Id.* Cheremisinoff equated sulfur with "sulfides," which, in his opinion, could be linked to sulfuric acid aerosols and sulfur based salts stemming from reduced sulfur compounds emitted from the mill. *Id.* Five of the corroded samples had no evidence of corrosive species, leading Cheremisinoff to conclude that moisture was the primary factor in the corrosion "or that precipitation washed the contaminants from the surface." *Id.* IP contends that the fingerprinting method is unreliable because the microscope used by St. Louis Testing Labs was not capable of detecting "sulfides." Instead, IP argues that the microscope detects "sulfur," which is far too broad a compound to connect the chemical depositions to the mill.

Having reviewed the study in detail, and having applied the *Daubert* factors, the Court concludes that the fingerprinting study lacks sufficient indicia of reliability

for admission into evidence. First, the size of the study casts doubt on the significance of its results. Although there were 13 samples, they were selected from only seven different properties. Elevated chloride or sulfur levels were found in only eight of the samples (61.5%). Of those eight, sulfur and/or chlorine were found in only trace amounts at two. [*See* Record No. 200–8, pp. 80–81.] Although the Court's focus is on the method and not the results, it must nonetheless determine whether the opinion will be helpful to the jury. Part of this analysis is asking whether the expert's opinion would make any fact at issue more or less probable. In short, the ambiguous results would not help a jury decide whether the mill's emissions caused or contributed to the plaintiffs' alleged property damage.

There are other significant concerns that diminish the reliability of the study. Importantly, Cheremisinoff did not consider any background information concerning the test items such as their age, history, or chemical composition.[9] [Record No. 200–22, p. 97] The study does not account for the possibility that these items have been exposed to the elements for years, vulnerable to unknown domestic conditions, which could have contributed to corrosion and elevated chloride and/or sulfur levels.[10] Cheremisinoff did not know the pH of rain in Prattville, but conceded

---

[9] IP points out that most steel contains sulfur. *See United States v. Gulf Oil Corp.*, 47 C.C.P.A. 32, 37 (1959) ("All steels contain small amounts of . . . sulphur.")

[10] It appears likely that the items were kept outside, exposed to the elements for an unknown period of time. They are described as: "rain vent guard; light fixture cap; chrome plated RV door handle; pool pump electric box; shed roof trim; spring from trampoline; part of roof flange; part of shed

that it is a very humid environment. [Record No. 200–22, p. 99] And he did nothing to establish a baseline by determining the level of corrosion one might find in comparable objects that had not been exposed to the mill's emissions. *Id.* at p. 100.

While experts are not required to rule out every alternative cause, Cheremisinoff's failure to account for alternative causes of corrosion in this instance substantially impairs his already questionable theory. There is also no indication that this method has been peer reviewed or that it has gained general acceptance within the relevant scientific community. The excessive number of variables in this study, combined with the apparent margin of error render the study totally unreliable.

### 3.     Environmental Footprint

Cheremisinoff discussed the mill's large "environmental footprint," which he defined as the "magnitude and type of air emissions from an industrial facility." [Record No. 200–8, p. 14] He compared the mill's NEI and TRI data to that of other local industries, and concluded that IP's emissions far exceeded those of any other industry in the area. *Id.* at p. 34–42. He reported that the mill had released more than 448 million pounds of toxic air pollutants into the Prattville community between 1988 and 2002; and that it had placed the community's "health at risk" and "damaged its neighbor's properties." *Id.* at p. 86.

---

roof trim; breaker; flashing strip from bottom of house; copper drain pipe; heat pump vent; and roofing strip." [Record No. 200-8, pp. 80-84]

There is no allegation that any of the mill's emissions exceeded state or federal allowances, despite these opinions. Cheremisinoff does not purport to offer an opinion regarding medical causation or that any plaintiff was exposed to a specific dose of an emission. *See McClain*, 401 F.3d at 1242 ("the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question."). The plaintiffs have not explained how the potential general health effects of chemical emissions is relevant to any issue other than medical causation. As explained in more detail later in this memorandum, Dr. Cheremisinoff is not qualified to offer such an opinion. Accordingly, he may not testify regarding the potential health effects of emissions or that the mill placed the community's health at risk.

Although Dr. Cheremisinoff is precluded from offering opinions based on his corrosion study, to the extent it is relevant, he may provide background information regarding criteria air pollutants and property damage. [Record No. 200–8, pp. 71–77] In his report, he relies on EPA documents and other studies to suggest that the mill releases emissions capable of causing the plaintiffs' alleged property damage. *Id.* This may be considered in conjunction with other admissible opinions and the plaintiffs' testimony regarding their individual property damage claims.

### 4. Opinion on Odors

Cheremisinoff also reported on the plaintiffs' alleged exposure to obnoxious

odors. [Record No. 200–8, p. 44–47, 61] He relied on affidavits in which 100 plaintiffs attested that they smelled unpleasant odors[11] on a frequent or constant basis and had reactions including: tearing eyes; difficulty breathing; frequent headaches; coughing; ocular disorders; nausea; frequent sore throats; and various upper respiratory symptoms of discomfort.[12] *Id.* Cheremisinoff deduced that the odors detected by the community were mostly likely a result of the mill's uncontrolled fugitive emissions. *Id.* at p. 47. He provided specific data regarding the sources and types of odors typically produced by paper mills, as reported in scientific literature. *Id.* at pp. 44–49. In turn, he relied on health risk guidelines issued by various state and international agencies to conclude that the "Prattville Community has experienced excessive inhalation exposure risks historically through present times." *Id.* at pp. 51–70; 87–88.

While experts generally may not rely on the opinions of others, *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985), they may rely on facts or data of which the expert has been made aware if they it is type of information on which experts in that field would reasonably rely. Federal Rule of Evidence 703. Certainly, the plaintiffs' subjective descriptions of the odors do not have the same

---

[11] The plaintiffs described the odor as "rotten eggs, rotten cabbage, or a skunk-type smell." [*See* Record No. 200–18]

[12] Dr. Cheremisinoff expressly denied offering an opinion on medical causation but stated that he could "reference [his] knowledge and understanding of the standards and the warnings associated with exposure to chemicals." [Record No. 200–22, p. 10]

indicia of reliability as air dispersion modeling, or the other available objective methods of assessment that Dr. Cheremisinoff discussed during his deposition. [Record No. 200–22, p. 32]  Although the plaintiffs' statements are excerpted from sworn affidavits, it appears that each employed identical language to describe the odors, leading to the conclusion that these were not the plaintiffs' own words.  [*See* Record No. 200–18.]

Dr. Cheremisinoff also examined exposure guidelines for various chemicals common to paper mills.[13]  IP challenges Dr. Cheremisinoff's reliance on a these guidelines, suggesting that some of them are merely screening levels and should not be used as health criteria.  [Record No. 192, p. 35]  However, Dr. Cheremisinoff's failure to employ alternative methods of testing odor, as well as the distinctions among the various odor guidelines, are proper matters for cross-examination.  *See, e.g., Braggs v. Dunn*, 317 F.R.D. 634, 646 (M.D. Ala. 2016) (expert is not required to employ the "best" scientific method).

The plaintiffs claim that exposure to these odors caused them to suffer a host of physical reactions.  To the extent Dr. Cheremisinoff would provide an opinion on medical causation, he is not sufficiently qualified to do so.  For an expert to satisfy

---

[13] The EPA does not regulate odors under the Clean Air Act.  *See, e.g., Concerned Citizens of Bridesburg v. U.S. EPA*, 836 F.2d 777, 779 (3d Cir. 1987).  Although states may implement odor thresholds, *see, e.g., Save Our Health Org. v. Recomp of Minn., Inc.*, 37 F.3d 1334, 1335–36 (8th Cir. 1994), there is no allegation that such standards were violated, as Cheremisinoff did not perform testing with respect to odor.  [*See* Record No. 234, p. 45.]

the qualification requirement of Rule 702, he must possess the requisite skill, experience, and training to offer the testimony he intends to introduce. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (the area of the witness's competence must match the subject matter of his testimony). Cheremisinoff's expertise lies in chemical engineering and not in reviewing medical literature or determining whether chemical emissions cause health effects. *See, e.g., See also Jones v. Novartis Pharm. Corp.*, No. 2: 13-CV-624, 2017 WL 372246, at *10 (N.D. Ala. Jan. 26, 2017).

When asked whether he would offer an opinion on medical causation, Cheremisinoff stated, "Look, I'm a chemical engineer. . . . I'm not going to offer a medical causation opinion, but I am going to reference my knowledge and understanding of the standards and the warnings associated with exposure to chemicals. So that is the extent of my opinion in this matter." [Record No. 200–22, p. 10] In discussing whether odor presents a potential health risk, he commented, "I'd think the medical causation people are in a better position to comment on this." *Id.* at p. 28.

Accordingly, to the extent it is relevant, Dr. Cheremisinoff's limited opinion regarding exposure to odors is admissible. He may not testify regarding medical causation.

**B.    Defendant's Motion to Exclude Dr. Paul Rosenfeld [Record No. 193]**

The plaintiffs retained Dr. Paul Rosenfeld to perform an assessment of the Prattville community's environmental exposures to the mill's chemical emissions. [Record No. 200–13, p. 2] Rosenfeld holds a B.S. and M.S. in environmental science and a Ph.D. in soil chemistry. [Record No. 200–15, p. 3] He works as an environmental chemist for Soil Water Air Protection Enterprise (SWAPE), focusing on the fate and transport of environmental contaminants, risk assessment, and ecological restoration. *Id.* Rosenfeld has published many articles in his field and has performed extensive investigation and scientific modeling for litigation purposes. *Id.* at pp. 8–15.

### 1. Air Dispersion Modeling

AERMOD is a computer-based air dispersion modeling system designed for short-range dispersion of air pollutant emissions from a stationary industrial source. Rosenfeld used AERMOD to develop opinions regarding the plaintiffs' personal and property exposures to the mill's emissions.[14] [Record No. 200–13, p. 25] AERMOD requires meteorological and terrain data specific to the subject area, along with specific input parameters for pollution sources. *Id.* Rosenfeld used meteorological data from Montgomery, Alabama for 1992 as a representative year in Prattville, Alabama. *Id.* at p. 26. As for the physical locations, Rosenfeld randomly selected

---

[14] Rosenfeld's modeling estimated the maximum short-term (one-hour and three-hour) airborne concentrations of $PM_{10}$, $NO_x$, $SO_2$, and VOCs.

Cartesian coordinates spaced 50 meters apart, "dispersed through the Area of Concern surrounding the Site." *Id.* at p. 27. Rosenfeld used CAP emissions data obtained from the 2005 NEI to as representative pollution values. *Id.*

IP contends that Rosenfeld was required to use the plaintiffs' precise alleged exposure locations in his modeling. [Record No. 194, p. 7] It further argues that the 2005 NEI data cannot be used to assess the plaintiffs' exposure over the entire alleged exposure period, which for some plaintiffs dates back to 1967. [Record No. 194, p. 20] But absolute precision is not necessarily required in dealing with allegations of exposure to pollution that occurred more than fifty years ago. *See Fisher v. Ciba Specialty Chems. Corp.*, No. 03–0566, 2007 WL 2302470, at *8 (S.D. Ala. Aug. 8, 2007). Rosenfeld suggests that NEI and TRI data could be used in conjunction with his air modeling results to estimate the plaintiffs' exposure for years other than 2005. [*See* Rosenfeld Report, Record No. 200–13, p. 63] However, it is too late for that. The plaintiffs' expert disclosures were due by April 29, 2011. The plaintiffs have failed to identify any reason that this information could not have been included in Rosenfeld's original report.

Although Rosenfeld only modeled emissions of $PM_{10}$ (particulate matter 10), $NO_X$ (nitric oxide and nitrogen oxide), $SO_2$ (sulfur dioxide), and VOCs, his report supports his general professional knowledge regarding other typical emissions of paper mills. [*See* Record No. 200–13, pp. 17–18; 37–46.] To the extent his opinion

regarding those emissions is relevant to an issue at trial, he may testify regarding them.[15]

## 2.    Attic Dust Sampling

Rosenfeld sampled attic dust from ten residential homes and one church in Prattville for the purpose of "measuring the chemical fingerprint of [d]ioxins." [Record No. 200–13, p. 31]  Samples were collected and shipped to TestAmerica Analytical Testing Corporation using a method adopted by the EPA and the World Trade Center Indoor Air Task Force Working Group.  *Id.* at pp. 31–32.  The lab tested for the presence of dioxins/furans in accordance with EPA method 8290 using High Resolution Gas Chromatography/Mass Spectroscopy.  *Id.* at p. 32.

Dioxins and furans are comprised of a family of compounds referred to as congeners.  *Id.* Dioxins include 75 different congeners and furans have 135 different congeners.  *Id.*  Because exposure is typically to variable mixtures of dioxins and dioxin-like compounds, the EPA uses Toxicity Equivalency Factors (TEFS) to compare the toxicity of each individual toxin to the relative toxicity of a dioxin known as TCDD, which is the most-studied and most toxic of these compounds.  *See id.*

---

[15] Rosenfeld dedicated a significant portion of his report discussing the potential adverse physical effects in humans of exposure to various chemicals emitted by paper mills.  [Record No. 200–13, pp. 37–46]  However, in his deposition, he stated that he would not be offering an opinion regarding whether any compound he modeled caused or contributed to any illness alleged by any of the plaintiffs.  [Record No. 200–25, p. 19–22]  Instead, he stated "all of the medical opinions go to the medical doctors."  *Id.* at p. 19.

Rosenfeld opined that the attic dust samples collected provide an "indirect measure of air pollution over time and, together with other factors, provide data sufficient to establish exposure to the community from releases from the [mill]." *Id.* at p. 34. He concluded that elevated TCDD toxicity equivalents were detected in all of the samples. *Id.* at p. 34. A "fingerprint analysis" was performed, in which he compared the congeners detected in the attic dust samples to "congeners reported by IP" in its TRI reporting. *Id.* at p. 35. Rosenfeld determined that the congener makeup of the dioxins from the attic dust was substantially similar to that of emissions from the mill. *Id.* [*See also* Record No. 200–14, p. 13 (Table Comparison).]

IP argues that the congener known as "OCDD" is one of the most stable in the atmosphere and is emitted in great amounts from multiple, common sources. *Id.* at p. 38. IP also contends that the TEQ ("toxicity equivalent") values produced by the study actually increased with distance from the mill. *Id.* at p. 40. However, these matters are largely disagreements between the parties' experts and are not a basis for excluding Rosenfeld's opinions based on the fingerprinting analysis.

### 3. Opinions Regarding Property Damage

Rosenfeld opines that the plaintiffs' alleged property damage "may have been caused by particulate and corrosive chemical emissions deposited on property from the Mill." [Record No. 200–13, p. 11] In addition to the previous arguments, IP

contends that Rosenfeld did not quantify or even estimate the deposition of particulate matter or corrosive chemical emissions at the plaintiffs' property.

Rosenfeld's report includes the broad claim that "particulate matter deposition also causes and/or contributes to property damage." *Id.* at p. 17. Additionally, he provides that the mill's emissions (including particulate matter) form acidic compounds in the atmosphere, which can cause property damage. *Id.* at p. 18. In conjunction with his AERMOD study, he concluded that the mill is a "major source" of sulfur dioxide and nitrogen oxides and that these compounds, among others, "cause extensive damage" to property in Prattville. *Id.*

Rosenfeld's failure to estimate the alleged emission deposits is not a basis to exclude his opinion. He has reasonably linked the plaintiffs' claims of property damage to the mill's emissions through his AERMOD study. Unlike the plaintiffs' analogous personal injury claims, there is no indication that a "dose-response relationship" must be established through expert testimony. Any purported deficiencies in Rosenfeld's method may addressed on cross-examination or by IP's rebuttal expert.

### III.    Plaintiffs' Motions for Judicial Notice [Record Nos. 182, 197]

The plaintiffs have asked the Court to take judicial notice of approximately 200 "facts," which include statements reportedly issued by the EPA [Record No. 182 pp. 3–25] and matters related to chemical reactions involved in the corrosion

process [Record No. 197, pp. 3–6].

Federal Rule of Evidence 201 provides that the court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Courts have wide discretion to take judicial notice of "appropriate judicative facts" at any stage in a proceeding, including the summary judgment stage. *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014). However, taking judicial notice is a "highly limited process" *id.* (quoting *Dippin' Dots, Inc v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204-05 (11th Cir. 2004)) because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.* (internal citations omitted and quotation marks omitted).

"[T]he kinds of things about which courts ordinarily take judicial notice are (1) scientific facts: for instance, when the sun rises or sets; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). While some courts outside the Eleventh Circuit have judicially noticed EPA documents related to the establishment of standards, *see, e.g, Newark Grp., Inc. v. Dopaco, Inc.*, No. 2:08-2623, 2010 WL 1342268, at *1 (E.D. Cal. April 2, 2010)

(citing *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 702 n.22 (10th Cir. 2009)), the plaintiffs have not demonstrated that the tendered facts are the proper subjects of judicial notice. *See, e.g.*, *Hurd v. Garcia*, 454 F.Supp.2d 1032, 1054-55 (S.D. Cal. 2006) (party requesting judicial notice bears the burden of persuasion). Upon review of the proposed facts, it is clear that these are not kinds of "universal truths" contemplated by Rule 702. Rather than providing any meaningful argument that they are appropriate for judicial notice, the plaintiffs have provided approximately two pages of conclusory statements suggesting that the facts are not subject to dispute. [Record Nos. 182, 197, pp. 1–3]

Additionally, the plaintiffs have not established how each fact is relevant to the case. *See Cabrera v. Dream Team Tavern Corp.*, 12-CV-6323, 2016 WL 1627621, at *3 (E.D.N.Y. April 22, 2016) (internal citations and quotation marks omitted) ("Although . . . Rule 402 does not apply and Rule 201 does not require the noticed fact to be relevant, courts would be foolish to take judicial notice of an irrelevant fact."). Based on the foregoing, the plaintiffs' motions for judicial notice will be denied.

## IV. Plaintiffs' Motion for Partial Summary Judgment [Record No. 201]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, after adequate time for discovery and upon motion, summary judgment is properly granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

There is no genuine issue of material fact unless there is "sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor." *Chapman v. Al Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). In making this determination, the Court will review all evidence and make all reasonable inferences in favor of the non-moving party. *Id.* However, the non-moving party is not entitled to inferences that are based on conjecture or speculation. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).

The plaintiffs have moved for summary judgment regarding their negligence claims. [Record No. 202] The motion is based on IP's alleged settlement of property damage claims with two families, which the plaintiffs allege constitutes a "negligent application of [a] company policy that harmed the community and benefited IP." *Id.* at p. 2.

According to the plaintiffs, IP entered into a settlement with the Cartee family based on property that was damaged due to the mill's emissions. *Id.* at p. 3. IP representative Don Forst testified in his deposition that IP paid for the Cartees' air

conditioner and became interested in purchasing their land due to its close proximity to the mill. [Record No. 202–1, pp. 7–8] Forst testified that IP bought a new air conditioner for Tommy Thompson who lived very close to the mill and traveled frequently, leaving his elderly mother at home alone. *Id.* at 32. Plaintiffs' counsel asked Forst during his deposition, "Why did you decide to pay Tommy Thompson's air condition and not pay my clients' air conditioners?" *Id.* at 31. Apparently, Forst's explanation was not satisfactory.

The plaintiffs contend that IP created a duty to all Prattville citizens "when it started reaching out to and paying claims for certain members of the community."[16] [Record No. 202, p. 14] Relying on *Campbell v. State Farm Mutual Auto Insurance Co.*, 65 P.3d 1134 (Utah 2001), the plaintiffs suggest that IP has implemented a corporate scheme to reduce payouts for which IP is liable. But *Campbell* is factually inapposite to the instant case. State Farm was determined to have "repeatedly and deliberately deceived and cheated its customers" by setting monthly payment caps and rewarding insurance adjusters who paid less than the market value for claims. *Id.* at 1148. It also instituted a policy of unreasonably taking cases to trial, leaving its insureds liable for judgments in excess of policy limits. *Id.* at 1142-43. There is nothing to suggest similar conduct here.

---

[16] Don Forst's deposition indicates that the "settlements" were the results of individuals making claims with the mill rather than IP "reaching out" to any members of the community. [Record No. 202–1, pp. 31, 45]

Notably, *Campbell* did not involve negligence claims. Additionally, the cases relied upon by the plaintiffs involved a special relationship that does not exist in the instant matter. Although the plaintiffs have not established the legal significance of the alleged corporate policy, they have failed to show that a corporate policy existed based on the payment of two factually distinct claims outside the litigation. Simply stated, the plaintiffs have provided no authority for the proposition that IP had a duty to the entire Prattville community regarding these isolated settlement negotiations. Further, they have failed to show that this alleged settlement practice caused them harm. Accordingly, the plaintiff's motion for summary judgment will be denied.

## V.    IP's Motion for Summary Judgment on Negligence, Wantonness, Nuisance, Trespass, and Abnormally Dangerous Activity [Record No. 183]

### A.    Negligence and Wantonness

To prove that IP was negligent, the plaintiffs must show that IP owed a duty of care to the plaintiffs, IP breached that duty, the plaintiffs were harmed, and IP's breach was the actual and proximate cause of the harm. *See Bobo v. TVA*, 138 F.Supp.3d 1285, 1307 (N.D. Ala. 2015) (citing *Ford Motor Co. v. Burdeshaw*, 661 So.2d 236, 238 (Ala. 1995)). Expert testimony typically is required to establish the standard of care when the subject matter is beyond the understanding of the average juror. *Ins. Co. of the West v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1298 (11th Cir. 2012). To satisfy this requirement, the plaintiffs focus on the portion of Cheremisinoff's report which cites IP's purported shortcomings, including that its

"smokestacks are insufficient, [that] the facility could have developed programs to reduce its acid aerosols" and that it "has a long history of odor complaints from the community." [Record No. 223, pp. 13–14] The plaintiffs conclude that "these acts constitute negligence." *Id.* at 14.

Despite providing these opinions, Cheremisinoff expressly denied forming an opinion regarding whether any emissions sources at the mill had been properly managed or controlled. [Record No. 200–22, p. 13] Likewise, he disclaimed offering any opinions that the mill's practices did not comply with industry standards. *Id.* at p. 15. Negligence may not be assumed. *See Jim Bishop Chevrolet v. Burden*, – So.3d – 2016 WL 2610775, at *8 (Ala. May 6, 2016) (failure to present expert testimony—or any evidence—of the appropriate standard of care was fatal to *prima facie* claim of negligence). Cheremisinoff's statements regarding the mill's smokestacks and its potential to reduce acid aerosols are insufficient to establish the requisite standard of care.

Cheremisinoff confirmed that he "didn't focus on . . . the compliance related issues other than what [he] observed from what [he] believe[d] to be an underreporting in the TRI." [Record No. 200–22, p. 14] The test plaintiffs have not claimed that they were aware of the TRI or IP's reporting obligations under it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998) (EPCRA is designed to "inform the public about the presence of hazardous and toxic chemicals and to

provide for emergency response in the event of health-threatening release"). Accordingly, they have not alleged that a failure to satisfy the TRI's reporting requirements is a cause of their harm, as required to sustain a negligence action. *See, e.g., George v. Ala. Power Co.*, 13 So.3d 360, 364–65 (Ala. 2008). And because the plaintiffs have failed to present admissible expert testimony regarding IP's alleged TRI underreporting, the remaining plaintiffs' claims concerning TRI reporting necessarily fail. Accordingly, summary judgment will be granted in favor of IP with respect to all plaintiffs' negligence claims.[17]

Wantonness is conduct "carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code, § 6-11-20(b)(3) (1975). Specifically, wantonness involves "the conscious doing of some act, or the omission of some duty, under knowledge of existing conditions and while conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Ridgeway v. CSX Transp., Inc.*, 723 So.2d 600, 608 (Ala. 1998). Before one can be held liable for wantonness, it must be shown that, with reckless indifference to the consequences, he consciously or intentionally did some wrongful act or omitted some known duty that produced the injury. *Id.* (citing *Hamme v. CSX Transp., Inc.*, 621 So.2d 281 (Ala. 1993)).

---

[17] The deadline for expert disclosures regarding fate and transport, and the defendant's conduct was April 29, 2011.

Wantonness is a distinct tort rather than a severe form of negligence. *McCutchen v. Valley Home, Inc.*, 100 F.Supp.3d 1235, 1239 (N.D. Ala. 2015). *See also Sparks v. Ala. Power Co.*, 679 So.2d 678, 682 (Ala. 1996) (a jury may find a defendant wanton without finding the defendant negligent). Unlike negligence, wantonness does not require the plaintiff to establish a standard of care by expert testimony. *See Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.*, 785 F.Supp.2d 1258, 1287 (M.D. Ala. 2011).

The plaintiffs contend that IP's "continued heavy pollution," especially when relatively simple measures could significantly reduce it, rises to the level of wanton conduct. [Record No. 233, p. 14] Based on the evidence of record, however, a reasonable jury could not find that IP had "awareness and consciousness" that injury probably would result from its actions. *See Jinright v. Werner Enters.*, 607 F.Supp.2d 1274, 1276 (M.D. Ala. 2009). The plaintiffs have not identified any evidence that IP's emissions exceeded primary or secondary NAAQS, which are designed to protect public health and the environment. It defies logic to suggest that IP acted wantonly by performing expressly permitted activities that produced emissions within guidelines that the EPA deems safe for sensitive populations. *See, e.g., Hewitt v. Columbus*, No. 08AP–1087, 2009 WL 2759735, at *8 (Ohio Ct. App. Sept. 1, 2009) (unpublished opinion) (police officer's conduct did not rise to level of wantonness, especially where the conduct was expressly permitted by law).

Based on the foregoing, summary judgment will be granted in IP's favor with respect to all plaintiffs' wantonness claims.

## B.     Trespass

The plaintiffs also claim that IP's alleged release of obnoxious odors into the environment constitutes a trespass onto their property.  [Record No. 42, ¶ 40] However, odors cannot form the basis of a trespass claim, so to the extent the plaintiffs' trespass claim is based on obnoxious odors alone, summary judgment will be granted in favor of the defendant.  *See Borland v. Sanders Lead Co., Inc.*, 369 So.2d 523, 529–30 (Ala. 1979).

An indirect trespass may occur when chemical emissions flow from a defendant's property onto a plaintiff's property.  However, for a successful indirect trespass claim, a plaintiff must show: an invasion affecting an interest in the exclusive possession of his property; an intentional doing of the act which results in the invasion; reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and substantial damages to the res.  *Abrams v. Ciba Specialty Chems. Corp.*, 663 F.Supp.2d 1243, 1252 (S.D. Ala. 2009).  *See also Borland*, 369 So.2d at 529.  In case there was any doubt, "res" is defined as "[a]n object, interest, or status, opposed to a person." *Capital Yacht Club v. Vessel Aviva*, 409 F.Supp.2d 1, 5 n.5 (D.D.C. 2006) (quoting BLACK'S LAW DICTIONARY, 1332 (8th ed. 2004)).  Accordingly, summary judgment will be granted in favor of IP with

respect to the trespass claims of the plaintiffs alleging only personal injuries.

## C.    Nuisance

A private nuisance is one that is limited in its injurious effects to one or a few individuals. *Russell Corp. v. Sullivan*, 790 So.2d 940, 951 (Ala. 2001) (citing Ala. Code. § 6-5-121 (1975)).   In response to IP's motion for summary judgment, the plaintiffs have abandoned their private nuisance claims and concede that their claims are properly characterized under the public nuisance doctrine.

Typically, a public nuisance "gives no right of action to any individual, but must be abated by a process instituted in the name of the state." *Russell Corp.*, 790 So.2d at 951.    However, an individual may recover under a public-nuisance theory if that individual suffered a "special damage" that is different in kind and degree than that suffered by the public in general.  *Id.*  (citing Ala. Code § 6-5-123 (1975)). The Amended Complaint did not explain the nature of this claim but recited that the plaintiffs had suffered special damages in which the public did not participate. [Record No. 42, ¶ 56]  Through briefing, the plaintiffs later alleged that the entire Prattville community was subjected to odors from the mill, but that the plaintiffs had experienced special damages in the form of property damages.

It is well-established that an entity must behave in a negligent manner if its expressly permitted activities are to constitute a nuisance.  *See City of Birmingham v. City of Fairfield*, 375 So.2d 438, 441 (Ala. 1979).  It is undisputed that the mill

operates pursuant to a Major Source Operating Permit issued by ADEM, per Title V of the Clean Air Act. [Record No. 200–30, p. 7] The Operating Permit integrates the mill's many state and federal requirements concerning air emissions, and contains approximately 200 requirements. Alabama courts have repeatedly explained that "there can be no abatable nuisance for doing in a proper manner what is authorized by law." *City of Birmingham* at 375 So.2d at 441-43 (quoting *Fricke v. City of Guntersville*, 36 So.2d 321, 322 (Ala. 1948)). An entity must behave in a negligent manner if its expressly permitted activities are to constitute a nuisance. *Id.* Because the plaintiffs' negligence claims fail, their nuisance claims also fail.[18] *See, e.g., Hilliard v. City of Huntsville*, 585 So.2d 889, 893 (Ala. 1991).

Additionally, section 6-5-127(a) of the Alabama Code provides that an industrial plant cannot become a nuisance, based on changed conditions, after the plant has been in operation for more than a year, unless the nuisance is a result of negligence or improper operation. *See Fisher v. Ciba Specialty Chems. Corp.*, No. 03-0566, 2007 WL 2995525 at *20 (S.D. Ala. Oct. 11, 2007). The plaintiffs failed to respond to IP's argument that their nuisance claims are barred based on this provision of the Alabama Code. The mill has been in operation since 1967 and there

---

[18] Although Congress has not completely preempted the field of emissions regulations, it is unclear that a nuisance action can proceed when federal air quality regulations have not been violated. *See North Carolina v. TVA*, 615 F.3d 291, 302–03 (4th Cir. 2010) (recognizing the "considerable mischief" in nuisance actions seeking to establish emissions standards different from those set by state and federal law).

is no indication that, within its first year of operations, the mill was adjudicated a nuisance by any court of competent jurisdiction. *See Fisher*, 2007 WL 2995525 at *20. Accordingly, as to the plaintiffs who moved to the area after operations began, the nuisance claims are barred on this additional ground. *See Swedenberg v. Phillips*, 562 So.2d 170, 172–72 (Ala. 1990) (section 6-5-127 does not apply when plaintiffs "were residing on their property before the operations began").

Based on the foregoing, IP is entitled to summary judgment with respect to all plaintiffs' nuisance claims.

### D.     Abnormally Dangerous Activity

Alabama follows the Restatement (Second) of Torts approach regarding abnormally dangerous activities. *Harper v. Regency Development Co., Inc.*, 399 So.2d 248, 253 (Ala. 1981) (citing Restatement (Second) of Torts §§ 519–20 (1977)). It provides that some activities are so inherently dangerous that the risk of harm cannot be eliminated, regardless of the precautions taken. *Id.* As a result, strict liability is imposed for harm resulting from these activities. *Id.* While it appears that Alabama courts have limited this doctrine to blasting cases, *see Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1286 (M.D. Ala. 1999), expansion of the doctrine to other activities has not been foreclosed. *See Avery v. Geneva Cnty.*, 567 So.2d 282, 288 (Ala. 1990). *See also Dickinson v. City of Huntsville*, 822 So.2d 411, 416 n.2 (Ala. 2001) (suggesting the doctrine may extend to the aerial spraying of pesticides

based on *Boroughs v. Joiner*, 337 So.2d 340 (Ala. 1976)).

In determining whether an activity is abnormally dangerous, the Court considers the following factors:

> existence of a high degree of risk of some harm to the person, land, or chattels of others; likelihood that the harm that results from it will be great; inability to eliminate the risk by the exercise of reasonable care; extent to which the activity is not a matter of common usage; inappropriateness of the activity to the place where it is carried on; [and] extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520. While all of these factors are not required, ordinarily, the presence of several are necessary to impose strict liability. *Id.*, cmt. f. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." *Id.*

The first three factors weigh against characterizing the mill's activities as inherently dangerous. An activity that is inherently or abnormally dangerous must pose a high degree of risk to the "person, land or chattels of others." *Id.* cmt. g. It is undisputed that the defendant's activities produce chemical compounds which have the potential for harmful effects under certain circumstances. While the plaintiffs have alleged some property damage and exacerbations of health conditions, there is no evidence that this type of harm cannot be eliminated through

the exercise of reasonable care. Both the EPA and the Alabama Department of Environmental Management heavily regulate the defendant's activities to prevent the precise type of harm the plaintiffs allege. NAAQS are developed based on "the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [pollutants] in the ambient air, in varying quantities." *Mississippi v. EPA*, 744 F.3d 1334, 1346 (D.C.C. 2013) (quoting 42 U.S.C. §§ 7408(a)(2), 7409(d)). The EPA has deemed its emissions standards safe for the environment and the population at large, including those with respiratory sensitivities.

The Restatement provides that an abnormally dangerous activity is, by definition, unusual. Restatement (Second) of Torts § 520, cmt. f. Although the average citizen might not engage in the activities of the defendant, the paper industry is neither uncommon nor unusual. Additionally, the mill has been in operation in Prattville since 1967 and employs approximately 550 people. [Record No. 200–37] It is the largest manufacturing employer in Prattville and Autauga County. *Id.* The interests of a particular town whose livelihood depends on an activity may be such that the activity will be regarded as normal for that community, notwithstanding the risks. *Id.* at cmt. k.

It does not appear that the operation of a paper mill has been deemed abnormally dangerous and, therefore, the subject of strict liability, by any court.

Considering the Restatement § 520 factors, it is clear that this activity is not the type contemplated in connection with this strict liability doctrine. The record reveals that the risk of "great harm" is low, while the ability to eliminate the risk of harm through the use of pollution-reduction techniques is quite high. Alabama courts often permit juries to determine whether an activity is abnormally dangerous. *See Beddingfield v. Linam*, 127 So.3d 1178, 1190 (Ala. 2013). In this case, however, there is no genuine issue of material fact upon which a reasonable jury could find that the operation of a paper mill constitutes an abnormally dangerous activity. Accordingly, summary judgment will be granted in favor of the defendant on the plaintiffs' strict liability claim.

## VI. IP's Motion for Summary Judgment on Plaintiffs' Personal Injury Claims [Record No. 185]/ IP's Motion to Exclude the Opinion of Dr. Allan Goldstein [Record No. 195]

IP has moved for summary judgment on all plaintiffs' personal injury claims based on the plaintiffs failure to present admissible evidence of causation.[19] [Record No. 185] This motion also will be granted.

The Eleventh Circuit has noted that "[t]oxic tort cases . . . are won or lost on the strength of the scientific evidence presented to prove causation." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1297 (11th Cir. 2005) (quoting *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002)). The plaintiffs must

---

[19] There are 303 plaintiffs who assert personal injury claims. [Record Nos. 185, p. 6; 287, p. 5]

establish both general and specific causation through expert evidence. *See Benkwith v. Matrixx Initiatives, Inc.*, 467 F.Supp.2d 1316, 1322–23 (M.D. Ala. 2006) (citing *McClain*, 401 F.3d at 1239). General causation requires proof that the emissions in question *can* cause the negative health effects the plaintiffs allege. *See id.* Specific causation requires proof that the emissions, and not some other factor, *did* in fact cause the individual plaintiffs' negative health effects. *See id.*

There are two broad categories of toxic tort cases—those in which the medical community generally recognizes the toxicity of the substance in question and those in which it does not recognize "both the toxicity of the substance and the cause of the alleged injury." *Id*. (citing *McClain*, 401 F.3d at 1239) (examples of the first category include: "toxins like asbestos, which causes asbestosis and mesothelioma; silica, which causes silicosis, and cigarette smoke, which causes cancer."). Because this matter falls into the second category, the Court is obligated to conduct a more extensive *Daubert* analysis regarding the opinions of plaintiffs' causation experts. *See McClain,* 401 F.3d at 1239. *See also Jones v. Novartis Pharm. Corp.*, No. 2: 13-CV-624, 2017 WL 372246, at *4 (N.D. Ala. Jan. 26, 2017) (first category is "small number of cases where the [medical] community generally recognizes and agrees upon the toxicity of the substance at issue to the injury alleged").

Dr. Allan Goldstein, a board-certified pulmonologist, was retained to examine the plaintiffs who alleged personal injuries and to offer an opinion on causation.

[Record No. 200–12]  Goldstein examined some of the test plaintiffs, but appears to base his opinions largely on the plaintiffs' subjective complaints.  "They would tell me about an odor," Goldstein stated.  [Record No. 200–24, p. 12]  "[T]hey could smell the odor and when they smelled the odor, that's when, if they were going to have symptoms, they did have symptoms." *Id.*  Ultimately, he opined that the plaintiffs experienced exacerbations of respiratory conditions caused by inhalation of emissions emanating from the Prattville mill.  *Id.* at p. 8.

Goldstein did not offer an opinion on general causation.  Reliable bases for inferring general causation including "the dose-response relationship, epidemiological studies, the amount of background risk of the disease, an understanding of the physiological mechanisms involved, and clinical studies or tests," were notably absent.  *See In re Denture Cream Prods. Liab. Litig.*, 795 F.Supp.2d 1345, 1351 (S.D. Fla. 2011).  Goldstein's "report" consisted of a series of letters to plaintiffs' counsel in which he reported the results of his examinations and medical records review of the test plaintiffs.  [Record No. 200–11, 12]  There was no mention of any particular emission Goldstein believed to be responsible for the plaintiffs' exacerbations.  Rather, he alleged that "air pollution, including that which comes from [IP] would exacerbate symptoms." *See id.*at p. 4.

Goldstein conceded during his deposition that he had not attempted to determine the specific compounds or chemicals being emitted from the mill.

[Record No. 200–24, at p. 13]   Additionally, he declined to comment regarding whether there is a safe level for exposure to sulfur compounds, nitrogen compounds, carbon compounds or particulate matter for triggering the plaintiffs' exacerbations. *Id.* at p. 17.   Instead, he testified, he would depend on a toxicologist and industrial hygienist for all of this information.  *Id.* at pp. 13, 17.

The plaintiffs contend that Cheremisinoff's report is sufficient to establish general causation because he opined that IP releases chemicals that "have known respiratory implications." [Record No. 235, p. 5]  As explained previously, however, Cheremisinoff is not qualified to testify regarding medical causation.  The plaintiffs argue alternatively that the court should take judicial notice that the mill's emissions are respiratory irritants.  [Record No. 231, p. 4]  However, the plaintiffs must provide expert testimony to establish both general and specific causation.  *See, e.g., Jones v. Novartis Pharm. Corp.*, No. 2: 13-CV-624, 2017 WL 372246, at *4 (N.D. Ala. Jan. 26, 2017).

Without predicate proof of general causation, the plaintiffs' personal injury claims fail and the need to consider the plaintiffs' ability to establish specific causation disappears.  *See Sutherland v. Matrixx Initiatives, Inc.*, No. 04–129, 2006 WL 6617000, at *11 (N.D. Ala. 2006).  The Court notes, however, that Goldstein did not offer an admissible opinion regarding specific causation as to the test plaintiffs.  One crucial requirement is showing that the individual was exposed to a

"sufficient amount of the substance in question to elicit the health effect in question." *McClain*, 401 F.3d at 1242–43. Goldstein was unfamiliar with the term "dose," and reported that he did not "get involved" with the plaintiffs' amount of exposure. [Record No. 200-24, at p. 10–11] His letter reports demonstrate that he did little more than repeat the plaintiffs' subjective reports about smelling an odor. Goldstein then connected the plaintiffs' alleged ailments to the odor, which he then attributed to the emissions from the mill. As these opinions are based mainly on anecdotal evidence and temporal proximity, they are not reliable and would not be admissible. *See Allison*, 184 F.3d at 1312.

Based on the foregoing analysis, the defendant's motion to exclude Goldstein's testimony [Record No. 195] and the motion for summary judgment on all plaintiffs' personal injury claims [Record No. 185] will be granted.

## VII.   Plaintiffs' Motion to Exclude Defendant's Expert Witnesses

### A.     Motion to Exclude Dr. Douglas Daugherty, Ph.D. [Record No. 203]

IP retained Douglas Daugherty, Ph.D., to review and evaluation the opinions of Cheremisinoff and Rosenfeld. [Record No. 200–1] Daugherty is a chemical engineer and certified industrial hygienist. *Id.* at p. 14. He has performed air-related research consulting for 14 years and has significant experience with the use of AERMOD for industrial facilities.

Contrary to the plaintiffs' argument, the defendant's experts are not required

to "produce models or methods of their own," in rebutting the plaintiffs' expert opinions; however, they must satisfy *Daubert's* standards. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016). Accordingly, IP must show that Daugherty is qualified, that he relied on sufficient data and reliable methodology, and that his testimony would be relevant. *See id.*

The plaintiffs suggest that Daugherty is unqualified to testify because he has "never performed a reconstructive exposure model to evaluate the impacts of large point source industrial emissions on multiple individuals over a duration scale of decades." [Record No. 204, p. 11] District courts within the Eleventh Circuit have permitted experts to testify regarding "narrow sub-topics within [a] broader expertise, notwithstanding a lack of specific experience with the narrower area—as long as [the] testimony would still assist a trier of fact." *Remington v. Newbridge Secs. Corp.*, No. 13-60384, 2014 WL 505153, at *4 (S.D. Fla. Feb. 7, 2014) (citing *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) (concluding that real estate damages were within economic expert's broader expertise)). Although Daugherty's AERMOD experience is not identical to the modeling at issue, he has conducted AERMOD assessments of emissions from various industrial sources and rail yards. [Record No. 200–1, p. 14] The plaintiffs may address any questions regarding his AERMOD experience and methods through cross-examination.

Daugherty criticized Rosenfeld's use of NEI data in his air dispersion

modeling for this case, suggesting that internal IP documents would have produced more accurate results. The plaintiffs, in turn, argue that Daugherty's testimony should be excluded because the EPA "has promulgated the NEI as a standard for air modeling calculations." [Record No. 204, p. 7] Regardless, Daugherty did not opine that NEI data is never appropriate for air dispersion modeling—only that it produced unreliable results in this particular instance. [*See* Record No. 200–1, pp. 31–38.] Clearly this is a point of disagreement between the experts and not a basis for excluding Rosenfeld's opinion. The motion to exclude Daugherty's opinion will be denied.

## B.     Motion to Exclude Robert Pelt [Record No. 205]

Certain plaintiffs claim that the mill's emissions have caused damage to the roofs of their homes. The plaintiffs retained Robert Pelt to inspect the roofs and provide an opinion regarding whether the roofs show signs of damage beyond "typical aging and wear-and-tear, and, if so, the nature, cause, and extent of any such damage." [Record No. 200–5] The plaintiffs have moved to exclude Pelt's testimony, arguing that he is not qualified to offer an opinion on any form of roof damage "from or even related to any type of substance or emission" from the mill. [Record No. 206, pp. 4–5]

Pelt had worked in the roofing industry for twelve years at the time of his report. [Record No. 200–5, p. 6] His qualifications as a roofer are not disputed.

Since 1999, he has conducted or overseen approximately 15,000 roof inspections, installations, and repairs. [Record No. 200–5, p. 6] On April 21–22, 2011, Pelt personally inspected the roofs of the homes occupied by Joseph Albright, Hazell Anderson, Sheila Barnett, Virginia Brooks, Jessie Davis, Kay Hines, Scottie Jackson, John McLemore, Alice Pickett, Eddie Scott, Krista Smith, Theodis Smith, Shannha Stoudemire, and Barbara Tatum. *Id.* at 7. He examined the metal roofing components, applying the roofing inspection practices he uses in his daily work. *Id.*

Following his inspections, Pelt opined that any roofing damage was caused by old age, poor installation, neglect, and weather damage. Pelt found rust damage in only a handful of the roofs. For example, Theodis James' shingles did not overlap properly, leaving exposed nails, which had rusted. Pelt concluded that the roof was installed by an unskilled roofer. [Record No. 200–5, p. 13] John McLemore's trailer home was estimated to be more than twenty years old—Pelt believed the roof to be original. *Id.* at 11. Further, it had not received any type of coating to promote longevity. *Id.* Kay Hines' roof had rust on the metal around the dormers, which Pelt believed had been installed improperly. *Id.* at 9. Finally, Joseph Albright's roof had a significant amount of rust. Pelt believed that the tin roof had exceeded its lifespan, particularly since it did not have the coating necessary to promote longevity. *Id.* at 7. Albright confirmed during his deposition that the roof was original to the home. [Record No. 200–42, p. 14]

The court's gatekeeping function under *Daubert* applies to both scientific and non-scientific experts. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Whether basing testimony on professional studies or personal experience, an expert must employ the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id.* The court's inquiry under *Daubert* is a flexible one and is tied to the facts of the particular case. *Id.* at 150. *See also Turner v. State*, 746 So.2d 355, 360 (Ala. 1998); *Ferguson v. Lear Siegler Servs., Inc.*, No. 1: 09–635, 2012 WL 1058983, at *2 (M.D. Ala. March 28, 2012). Rule 702's advisory committee notes explain that, "[n]othing in [the 2000] amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."

Pelt did not provide any opinions regarding chemical emissions. As an experienced roofer, he is able to testify competently regarding his inspections and the possible causes of damage, as described above. The plaintiffs have not provided any legitimate basis for excluding Pelt's opinion. The motion will be denied.

### C.    Motion to Exclude Dr. David Garabrant [Record No. 210]

David Garabrant is a physician specializing in occupational medicine. [Record No. 200–2, p. 6] He is board certified in both occupational medicine and internal medicine. IP retained him to analyze the plaintiffs' experts' methodology

on general causation and to opine on the proper approach for offering an opinion on general medical causation. *Id.*

The plaintiffs contend that he is not qualified to offer opinions because he is not a practicing physician. However, he is a full-time researcher in occupational epidemiology and instructs physicians and graduate students in occupational health and the clinical practice of occupational medicine. *Id.* Over the past 30 years, his research has focused on the long-term health effects of chemicals on humans, and he has published over 170 peer-reviewed research articles and over 180 book chapters, technical reports, and abstracts. *Id.* at pp. 6–7. Many of his publications focus on the causation of health effects in humans from chemical exposures in the environment, including respiratory symptoms from inhalation. *Id.* at 7. Considering his background, it is clear that he is qualified to offer opinions regarding methodologies pertinent to general medical causation. The plaintiffs have not explained why Garabrant would need to be a practicing physician to offer such testimony.

Dr. Garabrant offered his opinion regarding the proper methodology for establishing a causal link between exposure and disease. *Id.* at 12. First, he discussed the "Hill criteria," which include: strength of association; consistency; specificity; specificity; temporality; dose-response; plausibility; coherence; experimental evidence; and analogy. *Id.* at pp. 12–13. Although the Eleventh

Circuit has not directly commented on the Hill criteria, the methodology has been approved by other circuit courts, as well as district courts within the Eleventh Circuit. *See, e.g., Gannon v. United States*, 292 F. App'x 170, 172–73 (3d Cir. 2008); *Jones v. Novartis Pharm. Corp.*, 2: 13-624, 2017 WL 372246, at *18-19 (N.D. Ala. Jan. 26, 2017). Further, the Third Restatement of Torts has embraced the approach. *Id.* (citing *Restatement*, § 28 cmt. c(3)).

Garabrant found that the plaintiffs' experts did not adequately address the proper methodology for establishing a causal link between exposure and disease. [Record No. 200–2, pp. 12–16] Notably, he concluded, the plaintiffs did not assess the dose-response relationship. *Id.* Garabrant has acknowledged that some of the chemicals at issue can have adverse effects on the respiratory tract, but contends that such an argument is irrelevant when there is no evidence of the amount of chemicals that allegedly were deposited in the plaintiffs' bodies. [Record No. 200-2, p. 16]

It appears that Garabrant's testimony would be limited to rebutting the plaintiffs' evidence regarding medical causation. Because the plaintiffs have not presented admissible evidence of medical causation, it is likely that Garabrant's testimony will be irrelevant to any issues going forward. However, the plaintiffs have not identified any valid reason for excluding Garabrant's opinion, and the motion will be denied.

### D. Motion to Exclude Dr. Roger McClellan [Record No. 212]

IP retained Dr. McClellan to address the potential health effects of emissions from the Prattville mill and to review the reports of Cheremisinoff, Rosenfeld, and Goldstein.  [Record No. 200–4, p. 12]  McClellan holds himself out as an expert in respiratory toxicology, aerosol science and human health analysis.  *Id.* at 8.  He obtained a Doctor of Veterinary Medicine degree in 1960.  *Id.* at p. 9.  He has worked for the U.S. Atomic Energy Commission and the Lovelace Foundation for Medical Education and Research, where he performed research regarding inhaled radioactive materials and chemicals.  *Id.*  He is a diplomate of the American Board of Toxicology (1980) and the American Board of Veterinary Toxicology (1970).  *Id.*  He has authored numerous articles (many of them peer-reviewed) and has edited books, most of which are concerned with respiratory toxicology.  *Id.* at 10.  He has served on numerous advisory bodies for public and private organizations, including EPA committees.  *Id.* at pp. 10–11.

McClellan opined that Cheremisinoff compiled only "generalized commentary" regarding the mill's emissions and, thus, it is not useful in evaluating the concentration of any compound in the Prattville community.  *Id.* at 31.  With respect to Rosenfeld's modeling, McClellan also opined that the data produced was "generalized" because Rosenfeld only used estimated emissions for 2005 and meteorological data for 1992.  *Id.*  Additionally, McClellan compared the estimated exposures from Rosenfeld's modeling to the NAAQS, and noted that they fell "well

below NAAQS levels for each Criteria Pollutant for which the EPA has promulgated a NAAQS." *Id.* at pp. 12-13. Finally, McClellan opined that Dr. Goldstein speculated that the plaintiffs' health conditions are related to mill emissions "without considering the exposure . . . or the potential for each substance to cause harm at those exposure levels." *Id.* at 32. Because Goldstein did not consider the exposure frequency, duration, concentration and the potential for each substance to cause harm at those exposure levels, Dr. McClellan opined that Goldstein's approach lacked "scientific rigor." *Id.*

The plaintiffs claim that because Dr. McClellan is "a veterinarian," he is unqualified to offer these opinions. [Record No. 213, p. 2] The plaintiffs have failed to flesh out this argument. Regardless, McClellan's expertise extends far beyond his degree in veterinary medicine. The plaintiffs further contend that McClellan's opinion boils down to the argument that Rosenfeld's modeled emission "concentrations" do not exceed NAAQS. *Id.* Plaintiffs allege that this is irrelevant because McClellan has no idea whether any of the individual plaintiffs were exposed to a pollutant level above that set by the EPA. However, it is the plaintiffs' burden to prove exposure—not the defendant's to disprove it. The plaintiffs' apparent attempt to shift the burden of proof onto the defendant does not render McClellan's opinion irrelevant.

The plaintiffs also suggest that McClellan's opinions are the result of "mere

speculation and conjecture." *Id.* at 6. However, the plaintiffs have made this argument in a general manner, having failed to cite any specific examples of deficiency in his report. *Id.* at 6–8. Accordingly, they have waived the argument. *See, e.g., United States v. Zanino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . and put flesh on its bones."). Notwithstanding waiver, it is evident that McClellan thoroughly explained the theories upon which he relied, including a "science-based paradigm," a "source-health response paradigm," the Hill criteria, and Rosenberg's failure to compare his results to the NAAQS. Any quarrel the plaintiffs have with these methods may be raised upon cross-examination or through questioning their own experts.

The motion to exclude Dr. McClellan's testimony will be denied.

### E.    Motion to Exclude Dr. James Wedner [Record No. 214]

IP retained James Wedner, M.D., to examine each Phase I Test Plaintiff alleging personal injuries. He was also asked to evaluate Dr. Goldstein's opinions, methodology, and analysis. [Record No. 200–7] Dr. Wedner is a licensed physician. At the time of his report, he was a professor of medicine at the Washington University School of Medicine. *Id.* at pp. 6–7. Wedner was Chief of the Division of Allergy and Clinical Immunology and Director of the Training Program in Allergy and Immunology. He was also Medical Director of Washington University

Medical School's Asthma Center. *Id.*

Dr. Wedner was asked to provide a specific causation opinion for each test plaintiff. *Id.* at 7. He examined each plaintiff, ordered and reviewed diagnostic tests, and reviewed the plaintiffs' medical records. *Id.* He obtained each plaintiff's medical and social histories, including family histories and medication histories; performed a physical examination; performed a chest x-ray, a pulmonary function test (pre- and post-bronchodilator spirometry lung volumes, and "DLCO.") *Id.* at 7. Wedner obtained blood samples and tested the plaintiffs for common aeroallergens using a testing method known as "RAST." *Id.* at 7–8. He relied on his experience as a clinical doctor, literature searches, and the exam results to reach a conclusion about each particular plaintiff. *Id.* at 8. He determined that several of the plaintiffs did not actually present with respiratory complaints and had reported as much in their subjective histories.

Wedner criticized Goldstein's methodology. *Id.* at 9. First, he opined that Goldstein did not review complete medical histories or examine each of test plaintiffs. *Id.* at 10. Instead, in Wedner's opinion, Goldstein had given undue weight to the plaintiffs' subjective complaints. *Id.* Wedner further reported that he was not aware of any accepted method in which a medical examiner simply relies on the patient's self-report regarding the cause of his or her condition. *Id.* at 11.

Although the plaintiffs argue that Wedner's testimony does not meet the basic

requirements of Rule 702, they have not identified any methodological deficiencies. Instead, they have attacked his conclusions which is not a proper basis for challenging admissibility under *Daubert* and its progeny. As with their challenge to McClellan's opinion, it appears that the plaintiffs attempt to shift their burden of proving exposure and dose onto the defendant. [Record No. 215, p. 2–3 "[Wedner] doesn't know, and cannot know, the actual amounts Plaintiffs were dosed with over their lifetime."] As previously explained, this is not a basis for excluding IP's expert testimony, particularly when the plaintiffs have not presented their own expert testimony regarding the dose-response relationship.

In short, the plaintiffs have failed to identify any valid basis for excluding Dr. Wedner's testimony. The motion will be denied.

### F.      Motion to Exclude Dr. Walter Shields [Record No. 216]

IP retained Dr. Shields to evaluate Dr. Rosenfeld's theory that the mill's emissions had contaminated the plaintiffs' homes with dioxins and furans. [Record No. 200-6, p. 8] At the time of his report, Shields was the Director of Environmental and Earth Sciences Practice of Exponent Incorporated and a Principal Scientist in Bellevue, Washington. *Id.* He holds a B.S. and M.S. in Forest Science and a Ph.D. in Soil Science. *Id.* He specializes in the investigation of release, transport, environmental fate, and chemical fingerprinting of dioxins and furans. *Id.* at 9. He has studied dioxins and furans in soils and house and attic dust at more than 20 sites

in the United States. *Id.*

Shields opined that Rosenfeld's "fingerprinting" study was flawed and unreliable because the comparison made was based on the most common dioxin/furan congener. *Id.* According to Shields, Rosenfeld's approach is "analogous to concluding that simply because sugar is the predominant ingredient in two pieces of candy, both pieces of candy must have been made by the same confectioner." *Id.* Shields also alleged that Rosenfeld did not account for other common sources of dioxins and furans, including traffic, residential heating, and other domestic emissions. *Id.* Shields believed that Rosenfeld "incorrectly used a residential soil screening criterion to assert that the dioxin/furan attic dust values [were] 'elevated,'" ignoring a more appropriate screening developed by the EPA. *Id.*

The plaintiffs contend that Shields' opinions are "fundamentally flawed" due to a "misguided basis" and "lack of substantive analysis." [Record No. 217, p. 2] In support of their motion, the plaintiffs argue Shields ignored that the mill is a "major source" of air pollution and is the "largest emitter of dioxins and furan[s] in the Prattville Community." *Id.* at 6. The plaintiffs further contend that Shields improperly attacked Rosenfeld's opinions that "'fingerprinting' of the dioxin[s] and furans in the Prattville Community perfectly match those that IP reports." *Id.* at 7.

The plaintiffs also argue that Shields' opinions are not the product of reliable

principles and methods, as he is not familiar with scientifically accepted attic dust modeling. *Id.* at 8. Upon review of Shields' report, however, it does not appear that he criticized the modeling Rosenfeld employed, but rather, the *fingerprinting* because the congener profile was too common to show that the furans and dioxins found in the plaintiffs' homes came from the mill. *Id.* at 13. Not only is Shields an expert in this particular field, he cited numerous scientific articles to support his methods and conclusions. *See id.* at 13–16. The issues raised by the plaintiffs are proper items for cross-examination but not a reason to exclude the witness' testimony. The motion will be denied.

### G. Motion to Exclude Dr. R.M. Latanision [Record No. 218]

IP retained Ronald Latanision to investigate claims that the mill's emissions have led to property damage as alleged in Cheremisinoff's report and the plaintiffs' affidavits. [Record No. 200-3] Dr. Latanision holds a B.S. in metallurgy and a Ph.D. in metallurgical engineering. He also holds joint emeritus appointments in the Departments of Materials Science and Engineering and Nuclear Engineering at the Massachusetts Institute of Technology ("MIT"). He is also the Director (emeritus) of the H.H. Uhlig Corrosion Laboratory in the Department of Materials and Science and Engineering at MIT and has published over 200 articles in his fields of expertise, mostly focusing on corrosion. *Id.* at p. 9. Dr. Latanision reviewed the analysis of the 13 metal objects collected for Dr. Cheremisinoff's corrosion study. He also

visited the mill and toured the areas where the 13 objects were collected.

For the reasons already discussed, Cheremisinoff's corrosion study is inadmissible. Accordingly, it appears that most, if not all, of Latanision's anticipated rebuttal testimony will no longer be relevant at trial. Regardless, the plaintiffs have not identified any valid bases for excluding Latanision's opinions. Although they contend that the opinions are based upon insufficient facts or data, Latanision merely criticized Cheremisinoff's methods and opinions in this case, based on scientific publications and his extensive expertise in the field of corrosion. [Record No. 200-3, pp. 11–27, 37] The motion to exclude Latanision's opinion will be denied.

## VIII. IP's Motion for Judgment on the Pleadings/Summary Judgment on Plaintiffs' Fraudulent Suppression Claims [Record No. 187]

On August 21, 2009, the Court dismissed the plaintiffs' original fraudulent suppression claim because it did not comply with the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that fraud be pled with particularity. [Record No. 41] The requirements of Rule 9 alert defendants to the "precise misconduct with which they are charged" and protects defendants "against spurious charges of immoral and fraudulent behavior." *West Coast Roofing v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citing *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Plaintiffs must allege "the precise statements, documents, or misrepresentations made; the time, place, and person responsible for the statement; the content and

manner in which these statements misled the plaintiffs; and what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

The plaintiffs allege, in Count VIII of the Amended Complaint, that from 2000 through 2009, IP had actual knowledge that emissions from the mill could cause cancer in persons who came into contact with the emissions; that the emissions violated state and federal law; that the emissions were causing damage to real property; and that the emissions were causing personal injury. [Record No. 42, p. 27] The plaintiffs further claim that, despite this knowledge, IP made statements to the public, environmental regulators, its shareholders, and its employees, indicating that the mill was in full compliance with state and federal regulations and that its emissions did not pose a risk of causing cancer and other harms. *Id.* at pp. 27–28. According to the Amended Complaint, however, the date, content of each representation, and names of the employees who made the representations, are totally within the control of IP. *Id.* at p. 28.

Even when a plaintiff alleges that the defendant controls information required for a proper pleading, the complaint must "adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *United States v. East Ala. Healthcare Auth.*, 953 F. Supp. 1404, 1413 (M.D. Ala. 1996). Further, an allegation that the necessary information lies within the defendant's

control must be accompanied by a statement of facts upon which that allegation is based. *Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1280 (M.D. Ala. 1999). The plaintiffs have not satisfied that burden. Instead, they have simply recited that the necessary information is "totally within the control of IP." This assertion is significantly undermined by the plaintiffs' claim that IP made the statements at issue to the local media, in environmental filings, and to "rank and file employees." [Record No. 42, p. 27]

"Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. Dist. Attorney's Office*, 592 F.3d 1237, 1255 (11th Cir. 2010). While the court will accept the factual allegations of the complaint as true and construe them in the light most favorable to the non-moving party, it will not accept the parties' conclusory legal allegations. *See Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227, 1232–33 (11th Cir. 2005). Despite having had a second opportunity to do so, the plaintiffs have not made a threshold showing that the requisite information is within the exclusive control of the defendant. Accordingly, the defendant's motion for judgment on the pleadings will be granted. *See* Fed. R. Civ. P. 12(c). [20]

---

[20] Despite their inadequate pleading, the plaintiffs claim they have viable claims for fraudulent suppression based on IP's alleged underreporting to the TRI. Knowledge and reliance are essential elements of fraudulent suppression. *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1529 (11th Cir.

## IX. IP's Motion for Summary Judgment on Test Plaintiffs' Property Damage Claims [Record No. 189]

IP has moved for summary judgment regarding the test plaintiffs' property damage claims. [Record No. 68] To prevail on their only remaining claims, which are for indirect trespass, the test plaintiffs must not only prove that the mill's emissions entered their land, but that the emissions caused "substantial actual damage" to their property. *See Russell Corp.*, 790 So.2d at 947. To establish causation, the plaintiffs rely largely on Rosenfeld's report, as well as Cheremisinoff's corrosion study, which has been excluded.[21]

Rosenfeld's modeling purports to demonstrate the levels at which emissions were deposited at the property damage plaintiffs' locations. [Record No. 200–14, p. 4] He opined that certain emissions caused or contributed to property damage and led to "acid rain," which *can* cause corrosion of metals, deterioration of paint and stone, and *can* "dirty buildings and other structures." [Record No. 200–13, p. 17–18] Based on his review of NEI and TRI data, as well as plaintiff affidavits, Cheremisinoff concluded that the mill has "damaged its neighbor's properties."

---

1993). *See also* Ala. Code § 6-5-102. There is no evidence to satisfy either of these elements. Likewise, the plaintiffs' claims regarding IP's purported settlement of claims with third-parties are without merit. *See Interstate Truck Leasing, Inc. v. Bender*, 608 So.2d 716, 719–20 (Ala. 1992) (defendant must have duty of disclosure to plaintiff).

[21] The plaintiffs concede that Rosenfeld's fingerprinting study did not concern property damage. However, they contend that it demonstrates that the mill's emissions were deposited on the plaintiffs' properties. [Record No. 230, p. 5]

[Record No. 200–8, p. 87]

All of the test plaintiffs were deposed regarding the nature of their claimed property damage. Many admitted having "no idea" what caused their property damage and virtually none of the plaintiffs had an opinion regarding the cause of the damage aside from what their attorneys had told them. [Record No. 200–42, pp. 38, 45; 200–43, pp. 18–19; 207–1, p. 11–12; 207–4, p. 19; 207–6, p. 10; 207–7, pp. 12, 20; 207–8, p. 8–12; 207–17, p. 7; 207–10, p. 4; 207–18, p. 6–7] None of the plaintiffs had their property evaluated by outside sources or had been advised by anyone that the mill's emissions caused their property to be damaged. And many plaintiffs conceded that their property was damaged because it was old or worn out. [Record No. 200-42, p. 44; 207-3, p. 7; 207-4, p. 17-18; 207-23, p. 16]

The test plaintiffs cannot proceed to trial based on a mere hunch that the mill's emissions caused the property damage alleged. *See, e.g., Ex parte Mobile Power & Light Co., Inc.*, 810 So.2d 756, 760 (Ala. 2001). Rosenfeld opined that the emissions at issue are capable of damaging property, but he stopped short of opining that the mill's emissions caused the particular property damage at issue. Cheremisinoff believes the mill is responsible for the test plaintiffs' property damage because, according to him, it is "the largest polluter" in the community. [Record No. 200–8, p. 87] However, Cheremisinoff did not visit any of the test plaintiffs' residences or inspect any of the items alleged to have been damaged. His opinion does not

consider the test plaintiffs' actual property and, importantly, fails to account for the fact that the property includes, *inter alia*, metal roofs that were nearly thirty years old [Record No. 200-42, p. 14; 207-10, p. 35]; automobiles exposed to the elements for decades [Record No. 200-42, p. 14; No. 207-2, p. 26; 207-4, p. 10; 207-10, p. 15]; and jewelry made of unknown materials [Record No. 207-10, p. 24].

The test plaintiffs' depositions do not create genuine issues of material fact with respect to causation. There is simply no evidence—beyond speculation—that the mill is responsible for these damages, which include failing air conditioners, refrigerators, and microwaves of various vintages. Overwhelmingly, the plaintiffs have not identified an evidentiary basis connecting the mill's emissions to the alleged property damage. One plaintiff captured what seems to be the overall tone when he indicated that the mill might be responsible for anything that was broken at his home. [Record No. 207–17, p. 7]

Considering all of the evidence in the record, it is just as likely as not that something other than the mill's emissions caused the plaintiffs' alleged property damages. Accordingly, the test plaintiffs may not proceed to trial with these claims. *See So. Ry. Co. v. Dickson*, 100 So. 665, 669 (Ala. 1924) ("Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause."). The defendant's motion

for summary judgment regarding the test plaintiffs' property damage claims will be granted.

## X.    Conclusion

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.    The defendant's motion to exclude the report, opinions, and testimony of Dr. Nicholas Cheremisinoff [Record No. 191] is **GRANTED**, in part, and **DENIED**, in part.

2.    The defendant's motion to exclude the report, opinions, and testimony of Dr. Paul Rosenfeld [Record No. 193] is **DENIED**.

3.    The plaintiffs' motions for judicial notice [Record Nos. 182, 197] are **DENIED**.

4.    The plaintiffs' motion for partial summary judgment [Record No. 201] is **DENIED**.

5.    The defendant's motion for summary judgment regarding negligence, wantonness, nuisance, trespass, and abnormally dangerous activity [Record No. 183] is **GRANTED**.

6.    The defendant's motion to exclude the report, opinions, and testimony of Dr. Allan Goldstein [Record No. 195] is **GRANTED**.

7.    The defendant's motion for summary judgment regarding all plaintiffs'

personal injury claims [Record No. 185] is **GRANTED**.

8.    The plaintiffs' motion to exclude the report and testimony of Dr. Douglas Daugherty [Record No. 203] is **DENIED**.

9.    The plaintiffs' motion to exclude the testimony of Robert Pelt [Record No. 205] is **DENIED**.

10.    The plaintiffs' motion to exclude the report and testimony of Dr. David Garabrant [Record No. 210] is **DENIED**.

11.    The plaintiffs' motion to exclude the report and testimony of Dr. Roger McClellan [Record No. 212] is **DENIED**.

12.    The plaintiffs' motion to exclude the report and testimony of Dr. James Wedner [Record No. 214] is **DENIED**.

13.    The plaintiffs' motion to exclude the report and testimony of Dr. Walter Shields [Record No. 216] is **DENIED**.

14.    The plaintiffs' motion to exclude the report and testimony of Dr. R.M. Latanision [Record No. 218] is **DENIED**.

15.    The defendant's motion for judgment on the pleadings regarding the plaintiffs' fraudulent suppression claims [Record No. 187] is **GRANTED**.

16.    The defendant's motion for summary judgment regarding the test plaintiffs' property damage claims [Record No. 189] is **GRANTED**.

This 24th day of May, 2017.

Signed By:

*Danny C. Reeves* DCR

**United States District Judge**